# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

RICHARD POOLE,

       Plaintiff,

    v.

MAZDA MOTOR OF AMERICA, INC.,
*t/a Mazda North American Operations,*

       Defendant.

Civil Action No. TDC-20-0466

## MEMORANDUM OPINION

Plaintiff Richard Poole filed this civil action against Defendant Mazda Motor of America, Inc. t/a Mazda North American Operations ("Mazda" or "Mazda NAO") in which he alleges violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13–303 (West 2022), and negligent misrepresentation, in connection with an alleged defect in a Mazda MX-5 Miata that he purchased in November 2017. Presently pending before the Court is Mazda NAO's Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Mazda NAO's Motion will be GRANTED.

## BACKGROUND

On November 10, 2017, Plaintiff Richard Poole, who resides in Silver Spring, Maryland, purchased a new 2017 Mazda MX-5 Miata RF ("the Miata") from Brown's Chantilly Mazda ("Brown's Mazda"), an authorized Mazda dealership located in Chantilly, Virginia. During negotiations for the sale of the vehicle, the dealership informed Poole that the car did not come with a backup camera. When Poole stated that he did not want to buy the car without a backup

camera, the dealership offered to install a backup camera, as well as ambient lighting and a cargo net. Poole agreed, and as part of the sales transaction, Brown's Mazda issued to Poole a "We Owe Customer" form stating that the work would be performed within 30 days of the sale. Sales Receipt, Reply Ex. 1, ECF No. 66-1. In December 2017, Poole brought the car back to the dealership for the installation of the backup camera. Without Poole's knowledge, Brown's Mazda had contracted with an independent company, Mobile Dealer Solutions, to install an "aftermarket" backup camera that was not manufactured or provided by Mazda. Varanelli Aff. ¶ 8, Mot. Summ. J. Ex. 20, ECF No. 61-22.

As part of the sales transaction, Poole received a New Vehicle Limited Warranty ("the Warranty"), issued by Mazda NAO, which covered the Miata for a period of 36 months or 36,000 miles, whichever came first. The Warranty required Mazda NAO to remedy during the warranty period any "defects in materials and workmanship of all parts and components supplied by Mazda." Warranty at 12, Mot. Summ. J. Ex. 1, ECF No. 61-3. The Warranty did not cover aftermarket parts. The Warranty further provided that the terms of the warranty would be fulfilled by having an authorized Mazda dealer "without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts." *Id.*

Within a few months of purchasing the Miata, Poole began having problems with the car's battery. After only seven to ten days of not driving the Miata, he found that the car's battery would die. On May 21, 2018, Poole brought the Miata to a different dealership, Ourisman Mazda of Rockville, Maryland ("Ourisman Mazda"). The Ourisman Mazda service department tested the battery and found the amperage to be "within specifications." Poole Communications Log at 2, Mot. Summ. J. Ex. 3, ECF No. 61-5. The service director told Poole that the battery was likely

losing charge because he was not driving the car enough and suggested to Poole that he use a "trickle-charger" to keep the battery charged. *Id.*

Throughout the summer and into the fall of 2018, Poole continued to experience problems with the Miata's battery. On October 9, 2018, he brought the Miata into another local Mazda dealership, Koons Mazda of Silver Spring, Maryland. The service department again tested the battery and found "no issues." *Id.* at 3. The same day, Poole called the Mazda Customer Experience Center and advised Mazda NAO of his issues with his car battery. The customer service representative issued Poole two gift cards that he could use toward the purchase and installation of a new battery.

On April 11, 2019, Poole brought the Miata to yet another local Mazda dealership, Passport Mazda in Suitland, Maryland. Joseph Bonilla, the service director at Passport Mazda, agreed to investigate and diagnose the continuing battery issues. Bonilla found the Miata's battery to be faulty and replaced the battery under the vehicle's warranty.

On July 23, 2019, however, Poole returned to Passport Mazda because the same dead battery issue was continuing to occur. Passport Mazda found "[n]o faults in any modules." *Id.* at 5. Bonilla advised Poole to use a trickle charger provided by Passport Mazda to keep the battery charged and to call Mazda NAO for additional support with this ongoing problem.

That same day, Poole called Mazda NAO and spoke with a team lead for the Customer Service Center, who advised that he would contact Passport Mazda to review the current situation. On July 30, 2019, Sara Masoumi, a Mazda NAO Customer Service Representative, called Poole to provide an update. Masoumi told Poole that based on their communications with service representatives at the dealerships involved, including Passport Mazda, technical engineers at Mazda headquarters in Irvine, California had concluded that there was "no issue" with his car. *Id.*

3

at 6. Masoumi advised Poole to use the trickle charger provided by Passport Mazda to keep his battery charged due to his "pattern of insufficiently driving the vehicle." *Id.*

Dissatisfied with this response, Poole arranged for Bonilla to keep the car at Passport Mazda and try to replicate Poole's experience to determine the underlying problem with the battery. Bonilla and Passport Mazda kept Poole's car from August through November 2019.

In the meantime, Poole sent two certified letters to Mazda NAO requesting that it repurchase the Miata pursuant to the Maryland Automotive Warranty Enforcement Act, Md. Code Ann., Com. Law § 14–1502. On November 7, 2019, Poole received an email from Fernando Rea, a Senior Specialist in Customer Mediation at Mazda NAO. Responding to Poole's second letter, Rea explained that he was still gathering documents from the dealerships that had attempted to resolve the battery issue, but that what already stood out was the low mileage on the Miata. Rea asked Poole if he was using a battery charger or tender and then offered to forward relevant documents to Poole for his review. Rea followed up with Poole one month later, on December 9, 2019, but Poole did not respond to either of Rea's emails.

On November 29, 2019, Passport Mazda replaced Poole's battery again, this time at Poole's expense. On December 1, 2019, Poole drove the Miata to Brooks Huff Tire & Auto in Manchester, Pennsylvania to be evaluated by James Davis, a Master Certified Technician. Davis performed tests on the Miata over a two-week period and found that the battery charge declined to the point where it could no longer start. Upon completion of those tests on December 16, 2020, Davis concluded that there was a "defect in the design or manufacture of the vehicle" and that an electrical component in the car was staying on "due to a software problem or a defect in that component and slowly draining the battery." Davis Rep. at 1, Mot. Summ. J. Ex. 17, ECF No. 61-

19. Davis did not identify the specific software problem or defect. Poole did not share this information with Rea or anyone else at Mazda NAO at the time.

On January 16, 2020, Rea sent Poole a letter informing him that Mazda NAO would not fulfill his buyback request. According to Rea, Mazda NAO made this decision after reviewing the Warranty and repair history for the Miata and discussing the matter with service department staff directly involved with the inspections and repair of the vehicle. Rea stated that Poole had driven his vehicle "sparingly (1,146 miles in 21 months of ownership as of the 8/21/19 [dealership] visit)," that this lack of usage was "the source of continued battery performance issues and ultimately battery failure due to the lack of consistent charge," and that both the dealerships and the Mazda Customer Experience Center had recommended that he use a trickle charger to keep the battery charged. Buyback Letter at 2, Mot. Summ. J. Ex. 18, ECF No. 61-20. Accordingly, Mazda NAO concluded that the "source of the concern is not a result of a manufacturing defect" and that it had addressed Poole's concerns in accordance with the terms of the Warranty. *Id.* at 1.

On February 21, 2020, Poole filed the present action against Mazda NAO in which he alleged violations of the Maryland Automotive Warranty Enforcement Act, Md. Code Ann., Com. Law § 14–1502; the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310 (2018); and the MCPA, Md. Code Ann., Com. Law § 13–301, based on Mazda NAO's failure to resolve the battery problem or repurchase the Miata. On April 22, 2020, during the pendency of the litigation, Mazda NAO requested that that Poole permit another inspection of the Miata. With Poole's assent, Mazda NAO's Regional Technical Specialist, Charles Hougland, performed the inspection on July 14, 2020. Hougland found that the aftermarket backup camera had been improperly installed and was thus causing a draw on the car's battery. This draw on the battery was the source of Poole's persistent dead battery problem. Mazda NAO's counsel notified Poole and his counsel of this

5

finding in a letter dated July 27, 2020. Poole subsequently entered into a settlement agreement with Brown's Mazda. ECF No. 37.

On November 12, 2020, Poole filed an Amended Complaint in which he withdrew his claims under the Maryland Automotive Enforcement Warranty Act and the Magnuson-Moss Warranty Act, modified his MCPA claim, and added a negligent misrepresentation claim. The Amended Complaint centers on the allegation that Mazda NAO made misrepresentations to Poole and misled him "in the course of its dealings with him regarding the service issues." Am. Compl. ¶ 33, ECF No. 22. Count 1 alleges that Mazda NAO engaged in "unfair or deceptive trade practices" in violation of the MCPA by making false or misleading statements when it told Poole that there was nothing wrong with his car and that he just needed to drive it more and use a trickle-charger. *Id.* ¶ 44. Count 2, negligent misrepresentation, alleges that Mazda NAO negligently asserted three false statements: first, that there was nothing wrong with the vehicle; second, that the vehicle's battery problems were due to Poole's failure to drive his car more consistently; and third, that an appropriate solution to the battery problem was to use a trickle charger.

## DISCUSSION

In its Motion, Mazda NAO seeks summary judgment in its favor on both counts of the Amended Complaint. First, Mazda NAO argues that the MCPA claim fails because any alleged misrepresentations were not made "in the *sale or offer of sale*" of goods or services, as required under the MCPA. Mot. Summ. J. at 15, ECF No. 61-1. Second, Mazda NAO asserts that the negligent misrepresentation claim in Count 2 fails because any duty Mazda NAO had to Poole was limited to the terms of the Warranty, Mazda NAO representatives did not make any false

6

representations to Poole with the intent that he act upon them, Poole did not rely on any of the representatives' statements, and any alleged damages were not caused by Mazda NAO.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.    MCPA

The MCPA prohibits the use of an "unfair, abusive, or deceptive trade practice" in "[t]he sale" or "[t]he offer for sale" of "consumer goods" or "consumer services." Md. Code Ann., Com. Law § 13–303(1)-(2). "Sale" is defined as any "[s]ale of or offer or attempt to sell merchandise, real property, or intangibles" or "[s]ervice or offer for service which relates to any person, building, or equipment." *Id.* § 13–101(i)-(j). "Service" includes the "[r]epair of a motor vehicle." *Id.* § 13–101(j)(3). To establish a violation of this provision of the MCPA, a plaintiff must allege that: (1) the defendant engaged in an unfair or deceptive practice or misrepresentation that occurs in the sale or offer for sale of consumers goods or services; (2) the plaintiff relied upon the misrepresentation; and (3) the practice caused actual injury or loss. *Morris v. Osmose Wood*

*Preserving*, 667 A.2d 624, 636 (Md. 1995); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012), *aff'd sub nom. Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007). In *Morris*, the Court of Appeals of Maryland cautioned that this provision of the MCPA applies only to unfair or deceptive trade practices or misrepresentations made "in" the sale and did not "sweep as broadly" as another statute that covered unlawful practices made "in connection with the sale[]" of goods. *Morris*, 667 A.2d at 635. *Cf. Richwind Joint Venture 4 v. Brunson*, 645 A.2d 1147, 1157–58 (Md. 1994) (holding that in the context of an MCPA claim by a tenant against a landlord, the MCPA "applies to a lease at the time the consumer enters into it" and "is intended to govern deceptive trade practices which induce the prospective tenant to enter into such a lease," such that "we do not believe the legislature intended the [M]CPA to be applicable to statements or omissions concerning the leased premises occurring during the term of the lease"), *overruled on other grounds by Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616, 617 (Md. 2003); *Barranco v. Chesaco Motors, Inc.*, No. SAG-18-989, 2019 WL 423402, at *3 (D. Md. Feb. 1, 2019) (citing *Morris* and *Richwind* in concluding that "Section 13–303 does not bar unfair or deceptive trade practices in the performance or delivery of consumer services after a sale has occurred").

Consistent with *Morris*, the court in *Rutherford v. BMW of North America, LLC*, 579 F. Supp. 3d 737 (D. Md. 2022), held that the MCPA did not apply to claims that BMW service representatives made false or misleading misrepresentations to multiple plaintiffs in response to their complaints that their car engines consumed excessive amounts of engine oil, such as statements that the oil consumption level was normal. *Id.* at 743-44, 751. The court reached this conclusion because the alleged misrepresentations, including some made only a few months after the sale of the car, were not made "in the course of a sale." *Id.* at 751.

8

As in *Rutherford*, the alleged misrepresentations by Mazda NAO, which Poole identified as statements that "there was nothing wrong with the vehicle," that he "just needed to drive it more," and that he "needed to use a trickle charger," were not made in the course of the sale of the Miata. Am. Compl. ¶ 45. The Mazda NAO representatives who made statements like those identified by Poole were Masoumi, a Customer Service Representative, and Rea, a Senior Specialist in Customer Mediation. Masoumi spoke with Poole on July 30, 2019, over 18 months after the sale of the Miata, and told him that based on the assessment of Mazda technical engineers, there was no issue with his car, and he should use a trickle charger because of his infrequent use of the Miata. As for Rea, his statements to Poole began on November 7, 2019, two years after the sale of the Miata, and included an email in which Rea noted the low mileage on the Miata and asked if Poole was using a battery charger, and a January 19, 2020 letter in which Rea denied the buyback request and noted that Poole's car had been driven sparingly, that the limited driving was the source of the lack of consistent charge, and that a trickle charger had been recommended. As in *Rutherford*, the statements by Masoumi and Rea were made in the course of discussions about perceived problems with the car after the sale. *See Rutherford*, 579 F. Supp. 3d at 743-44. None occurred at the time of, or in relation to, the sale of the Miata.

Poole does not dispute the timing or nature of the statements but instead requests that the Court jettison the interpretation of the MCPA by the Maryland Court of Appeals in *Morris* that the unfair or deceptive practice must occur in the course of the sale in favor of the interpretations of other state courts of similar but distinct consumer protection statutes in those states, such as the Iowa Unfair and Deceptive Trade Practices Act and the Missouri Unfair and Deceptive Trade Practices Act. Beyond the reality that such interpretations cannot override the controlling authority interpreting the specific statute at issue here, Poole's reliance on the Iowa statute is misplaced in

9

that it uses the language "in connection with a sale," while the operative language of the MCPA uses the language "in" the sale. Md. Code Ann., Com. Law § 13–303. Significantly, in *Morris*, the Maryland Court of Appeals identified this precise difference in language as a reason to distinguish another state's interpretation of its own consumer protection statute and to find it inapplicable to the analysis of the MCPA. *Morris*, 667 A.2d at 636 (finding that the MCPA's prohibition on unfair and deceptive practices "in" the sale of goods was narrower than a Delaware state statute prohibiting unlawful practices "in connection with the sale" of goods). Thus, because alleged misrepresentations by Masoumi and Rea occurred long after the sale of the Miata and were not made in the course of a sale of goods or services, they are not actionable under the MCPA. *See id.*; *Rutherford*, 579 F. Supp. 3d at 751. The Court will therefore grant the Motion for Summary Judgment as to the MCPA claim.

### III.    Negligent Misrepresentation

In the negligent misrepresentation claim, Poole alleges that Mazda NAO had a duty to be truthful but made false representations about the cause of his battery problems, upon which Poole relied, and which caused him to incur damages. To state a claim for negligent misrepresentation, a plaintiff must establish five elements: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence." *Martens Chevrolet, Inc., v. Seney*, 439 A.2d 534, 539 (Md. 1982).

#### A.    Duty of Care

On the threshold issue of whether Mazda NAO owed Poole a duty of care in relation to potentially negligent false statements, where a plaintiff alleges economic loss due to the negligent

misrepresentation, "the injured party must prove that the defendant owed him or her a duty of care by demonstrating an intimate nexus between them." *Griesi v. Atl. Gen. Hosp. Corp.*, 756 A.2d 548, 554 (Md. 2000). An "intimate nexus" between two parties "may be demonstrated by showing contractual privity or its equivalent." *Id.*; *Abercrombie v. Nationwide Mut. Ins. Co.*, 999 F. Supp. 660, 663 (D. Md. 1998) (finding that "contractual privity, such as that created by a contract of employment, creates a sufficiently 'intimate nexus' to sustain the tort of negligent misrepresentation"), *aff'd,* 168 F.3d 481 (4th Cir. 1999). Such a duty of care may also arise from the fact that the parties were engaged in pre-contract negotiations, such as for employment or to purchase a business. *Griesi*, 756 A.2d at 554, 557-58 (citing cases).

Here, Mazda NAO had a contractual relationship with Poole in that it had agreed to provide the Warranty. Mazda NAO argues that its duty to Poole should be limited to the contractual duties defined in the Warranty based on *Jacques v. First National Bank of Maryland*, 515 A.2d 756 (Md. 1986), in which the Maryland Court of Appeals stated that "the mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Id.* at 534 (quoting *Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961)). *Jacques*, however, further stated that "[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort," and it upheld a negligence claim based on the misprocessing of a loan application even though there was a contractual relationship between the parties. *Id.* (quoting *Slacum v. Eastern Shore Trust Co.*, 163 A. 119, 120 (Md. 1932)). *Jacques* also did not involve a claim of negligent misrepresentation, and under *Griesi*, a duty to take care not to misrepresent facts is the kind of duty that arises out of the circumstances surrounding a contractual relationship. *Griesi*, 163 A.2d at 554. Where Mazda

NAO and Poole had a contractual relationship, and the discussions between Mazda NAO personnel and Poole specifically related to Poole's claim that the Warranty required Mazda NAO to take action to rectify the battery problem, the requisite "intimate nexus" existed to impose upon Mazda NAO a duty of care upon which a negligent misrepresentation claim can be based. *Id.*

### B.      Negligent False Statement

Even with the existence of a duty of care, Poole must present sufficient evidence to demonstrate that Mazda NAO negligently asserted a false statement. A false statement is one that is false as to a present or past event and is of a material fact. *Abercrombie*, 999 F. Supp. at 663; *Gross v. Sussex,* 630 A.2d 1156, 1162 (Md. 1993). A statement about a future event that proves to be false cannot support a claim for negligent misrepresentation. *Abercrombie*, 999 F. Supp. at 663. For a false statement to be made negligently, the speaker need not know that it was false at the time it was made, but the speaker's conduct in making the false statement must fall below the standard of care owed by the speaker to the recipient. *Gross,* 630 A.2d at 1162. Generally, the standard of care is "that degree of care" which a "reasonably prudent" person in the position of the speaker "would have exercised under the same or similar circumstances." *Jacques*, 515 A.2d at 764. An applicable industry standard may provide evidence of the relevant standard of care. *Id.; Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP,* 155 A.3d 445, 451 (Md. 2017) (stating that in the context of a negligence claim against a provider of professional services, "the professional is held to the standard of care of his or her profession"). Generally, the speaker must use "reasonable care in making representations" and can be deemed to have failed to do so if the speaker "did not know the facts he should have known" or "failed to investigate facts, or investigated them with less than reasonable case." *Griesi*, 756 A.2d at 555 (quoting Dan B. Dobbs, *The Law of Torts,* § 472 at 1353 (2000)). The duty and standard of care owed "varies with

circumstances and with the relation to each other of the individuals concerned." *Gross*, 630 A.2d at 1162 (quoting *W. Va. Cent. & P. Ry. Co. v. State*, 54 A. 669, 672 (Md. 1903)).

Here, the record does not provide sufficient evidence to support the conclusion that Mazda NAO negligently made false statements because the identified statements by Masoumi and Rea were not false, did not fall below the standard of care, or both. As to Masoumi's statements to Poole on July 30, 2019, she told Poole that there was "no issue" with his car and clarified that this statement was based on communications between the Mazda technical engineers and the dealership service representatives, including the representatives at Passport Mazda. Poole Communications Log at 6. She also stated that she was aware that Bonilla had provided him with a trickle charger, which he would need to "use all the time" based on the "pattern of insufficiently driving the vehicle." *Id.* There is no evidence that this account was an inaccurate summary of what both Mazda NAO and all the dealership service representatives who had inspected the Miata believed to be the state of the Miata and the reason for the battery problem. When Poole took the Miata to three different dealerships between November 2017 and July 2019, Ourisman Mazda found the battery to perform within specifications and suggested that the cause of the problem was Poole's lack of driving, Koons Mazda found no issues with the battery, and Passport Mazda technicians were not able to find anything wrong but replaced the battery and suggested that Poole use a trickle charger. Masoumi did not claim that she or Mazda NAO more generally had any basis of information other than the reports from these dealerships. Her statements that Bonilla had provided a trickle charger and that Poole did not drive the car frequently were true, and her advice that Poole would need to use the charger all the time in light of his infrequent driving is not demonstrably false. There is no evidence that using the trickle charger, though inconvenient, would not have addressed the problem of starting the car. Considered in context, where Masoumi

13

was clearly reporting on what the various service representatives believed to be the status of the Miata, her statements were not false.

As a technical matter, however, the statement that there was "no issue" with the Miata could be construed as false in that, though unknown to anyone at the time, there proved to be a drain on the battery caused by the faulty installation of the aftermarket backup camera. Poole Communications Log at 6. Viewing the facts in the light most favorable to Poole, the statement that he would need to use the trickle charger because of his infrequent driving could be deemed to be untrue in the sense that he would not need to use the trickle charger if the undiscovered battery drain caused by the aftermarket backup camera was detected and addressed. Even if viewed as false, however, the Court finds that no reasonable factfinder could conclude that Masoumi's statements recounting what she had heard from the Mazda technical engineers and, in turn, the dealership service representatives, fell below the standard of care for a person in her position. As a customer service representative, Masoumi's role was to "to be polite and to hear customers' concerns and assist them to the best of our ability." Masoumi Dep. at 39, Mot. Summ. J. Ex. 10, ECF No. 61-12. The standard procedure followed by customer service representatives in responding to customer complaints was to contact the relevant dealerships, which is what Masoumi did, through the Mazda technical engineers. There is no basis to conclude that Masoumi, as a customer service representative, had a duty to make an independent evaluation of the information, or to conduct her own technical analysis, before responding to Poole. Indeed, there is no evidence that Masoumi was technically trained or had the expertise needed to independently evaluate the information she was provided about Poole's battery issues.

Even if the claim could be construed as asserting that Mazda NAO breached a duty of care by failing to conduct its own evaluation or inspection of the Mazda before Masoumi responded to

14

Poole, rather than relying on the reports from the dealership service representatives, there is no evidence that would support such a conclusion. There is no evidence of any car industry standard that upon receiving a complaint to a national customer service telephone line, a car manufacturer must conduct its own inspection of the car rather than rely on reports from dealership service representatives who have inspected the car. Particularly where three different Mazda dealerships had inspected the Miata and reached the same conclusion, no reasonable factfinder could conclude that responding to a customer by providing that conclusion fell below the standard of care. Indeed, Poole has not pointed to any evidence in the record that he had asked Mazda NAO to conduct its own inspection of the Miata at the time of Masoumi's statements.

As to Rea's statements, Poole asserted in his deposition that the following three statements from Rea's November 7, 2019 email were false:

> "[W]hat already stands out regarding your concerns with cases of a dead battery/no start with your vehicle is your mileage."

> "As of the last visit your vehicle on 9/3/19 your vehicle had 1143 miles which means that you are averaging about 50 miles per month."

> "Do you use some sort of battery charger or tender to keep a consistent charge of your battery? I don't show that this was ever mentioned in the repair orders but I do see that at one point our Corporate Technical Support team asked that the dealership have a discussion with you about how lack of driving your vehicle will lead to shorter battery life and no start issues."

12/9/19 Email, Mot. Summ. J. Ex. 16, ECF No. 61-18.

The first statement expresses Rea's opinion or judgment that the documentation of his case causes him to focus on the vehicle's mileage and is not a statement of fact. It therefore cannot support a claim of negligent misrepresentation. *Gross,* 630 A.2d at 1162 (requiring a false statement of a material fact). Poole does not explain what is false about the second statement, and there is no evidence in the record that this mileage calculation was incorrect. Finally, Rea's third

15

statement incorporates both a question, which cannot be a false statement because it is only seeking information, and a statement recounting information from service records on the advice given to Poole, without asserting that the advice was correct or based on an accurate assessment of the problem. The evidence in the record confirms that Rea accurately described the contents of the service record, as the customer service notes show that multiple dealerships had conversations with Poole about how his lack of driving and low mileage could lead to battery issues. Poole has therefore failed to identify an actual false statement in the November 7, 2019 email.

As for Rea's January 16, 2020 letter declining to repurchase the Miata, Poole claims that the following statement was false:

> The information available in your case shows that your vehicle is driven sparingly (1,146 miles in 21 months of ownership as of the 8/21/19 visit) which is the source of continued battery performance issues and ultimate battery failure due to the lack of consistent charge.

Buyback Letter at 2.

As with the statements by Masoumi, there is no evidence that this not an accurate statement of Mazda NAO's assessment at the time it was made. Rea based the statement on the information available to him at the time, including "the repair histories and all the communications that were back and forth between everybody involved." Rea Dep. at 185, Mot. Summ. J. Ex. 9, ECF No. 61-11. Arguably, however, where later events revealed that the source of the problem was the aftermarket backup camera, the statement that the limited use of the Miata was "the source of continued performance issues" was technically false. Buyback Letter at 2. The issue is whether the evidence supports the conclusion that Rea breached the standard of care by making this statement without conducting further investigation. As with Masoumi's statements, Rea's statements were based on consistent information from three different Mazda dealerships identifying no defect or mechanical cause for the battery drain and therefore concluding that the

16

cause of the battery drain must be the infrequent use of the Miata.  Poole notes that after his conversation with Masoumi, he returned the Miata to Bonilla who kept it for three months as he attempted to replicate the situation faced by Poole, that Bonilla found that the battery drained without adequate explanation, and that Bonilla stated in his deposition that in this time frame he told an unnamed Mazda technical representative "something's going on with the car," by which he meant that he could not pinpoint a cause and felt like he was "chasing a ghost."  Bonilla Dep. at 42, Mot. Summ. J. Ex. 11, ECF No. 61-13.  Bonilla, however, did not offer any new explanation for the cause of the problem to the Mazda NAO representative, and though Bonilla stated in his deposition that he asked the unnamed Mazda technical representative to "maybe look a little deeper into" the battery issue, there is no evidence that he specifically requested that Mazda NAO conduct its own inspection.  *Id.* at 26, 43.  There is also no evidence that Rea was even made aware of this conversation.

Poole further references an October 25, 2019 email in which Bonilla told him that he "suspect[s] the vehicle has some type of defect that we have not been able to detect," and that he attached it to his October 2019 letter to Mazda NAO requesting that the company buy back the Miata.  Opp'n Mot. Summ. J. at 19-20, ECF No. 62-1.  Again, this statement does not identify any alternative explanation for the battery problem that would refute Mazda NAO's ongoing assessment.  Although Rea received this email before he issued the January 16, 2020 letter, he stated in his deposition that when Poole did not respond to his emails on November 7 and December 9, 2019, he did not have an understanding that Poole was requesting any further investigation into the battery problem.  Poole has identified no evidence that Rea was ever told that Poole wanted a Mazda technical engineer to inspect the Miata.  Thus, as with Masoumi, the evidence does not support the conclusion that a reasonable person in Rea's position, as a Senior

17

Specialist in Customer Mediation, should have, as a matter of industry practice or otherwise, conducted further investigation into the cause of the battery problem before making the statement in question.

In the end, Poole essentially argues that Rea acted negligently by reporting on the consistent assessment of Mazda NAO based on inspections by service personnel at three different Mazda dealerships without first insisting on additional investigation, even though the three different Mazda dealership service representatives had reached the same conclusion, and one of them had just conducted an analysis of the problem over a three-month period and still could not identify a specific cause for the problem. Notably, Poole's own independent Certified Master Technician, who examined the Miata in December 2019 without Mazda NAO's knowledge, did not provide a specific explanation for the problem or identify the actual cause. Although Poole claims that Mazda NAO refused to investigate, he has not pointed to any evidence that during the course of his discussions with Mazda NAO, he ever specifically asked Mazda NAO to send its own technical engineer to inspect the Miata. Mazda approved the only requests for technical steps to identify or resolve the problem: a May 2018 request to approve a software reprogramming by Ourisman Mazda and an October 2018 request for a new battery. Under these circumstances, the Court finds that the evidence does not support a finding that Mazda NAO negligently made false statements to Poole.

### C.     Reliance

Poole's negligent misrepresentation claim also fails because the record evidence does not support the conclusion that he justifiably acted in reliance on Mazda NAO's statements. Under Maryland law, reliance is established if "the misrepresentation substantially induced the plaintiff to act." *Nails v. S & R, Inc.*, 639 A.2d 660, 669 (Md. 1994). This element is established if the plaintiff "mainly and substantially relied upon the fraudulent representation," even if the plaintiff

"was in part influenced by other causes." *Id.* (quoting *McAleer v. Horsey*, 35 Md. 439, 453 (1872)). The representation need not "be the paramount, or the decisive, inducement which tipped the scales, so long as it plays a substantial part in affecting the plaintiff's decision." *Id.* at 670 (quoting William L. Prosser, *The Law of Torts*, § 108 at 715 (4th ed. 1971)).

Poole argues that he detrimentally relied on Mazda NAO's statements in that they "directly affected" his actions because had he been told the truth, "he could have had the vehicle repaired promptly, instead of being delayed" and "having to file suit." Opp'n Mot. Summ. J. at 22. However, even viewed in the light most favorable to Poole, the record establishes that Poole's actions after the alleged misrepresentations by the Mazda NAO personnel demonstrate a lack of reliance on those statements. During the numerous service visits in 2018 and 2019 when Mazda dealership service personnel told him that the battery problem was likely the result of infrequent driving and that he should use a trickle charger, Poole was consistently unconvinced and sought out other possible explanations through visits to other dealerships and his own research. When he began to speak to Mazda NAO personnel in 2019, he likewise did not rely on the statements by Masoumi and Rea that he understood to convey the message that nothing was wrong with the Miata, that the battery problem was the result of infrequent driving, and that a trickle charger would resolve the problem. After speaking to Masoumi on July 30, 2019, Poole was "incredul[ous] about her conclusion." Poole Dep. at 156, Mot. Summ. J. Ex. 5, ECF No. 61-7. Rather than obtaining and using a trickle charger or driving the Miata more frequently, Poole once again brought his car to Passport Mazda for additional testing, this time enlisting Bonilla to keep the car for several months to try to replicate the conditions experienced by Poole. Refusing to accept the explanation conveyed by Masoumi, Poole sent a letter to Mazda NAO on August 16, 2019 requesting that

19

Mazda repurchase the Miata because he "just would not accept the fact that the car would normally die after sitting for as little as 10 to 14 days." *Id.* at 168.

Likewise, after he received Rea's email on November 7, 2019, Poole, who at that point had already retained counsel, did not act in reliance on the statements, such as by starting to use a trickle charger or driving the Miata more frequently. As he stated in his deposition, Poole did not even respond to Rea's emails because he believed that he already had the information that Rea referenced, and "he already made his point and I didn't feel there was a reason to respond to him." *Id.* at 170-71. Instead, he obtained a new battery and then, on December 1, 2019, took the Miata for yet another inspection, this time by a Master Certified Technician in Pennsylvania who was unaffiliated with Mazda. Finally, after Rea sent the January 16, 2020 letter declining to repurchase the Miata and reiterating the statements that the cause of the problem was driving the car infrequently, Poole responded by filing the present lawsuit on February 21, 2020.

Thus, Poole engaged in no actions or omissions demonstrating reliance on the Mazda NAO statements. Rather, he continued to refuse to believe those statements and pursued other avenues in his continuing efforts to rectify the problem or secure compensation. *See Elliott v. Evans*, 942 F. Supp. 238, 241 (D. Md. 1996) (finding, in the context of a fraud analysis, that the plaintiff's actions did not demonstrate reliance on misrepresentations because they demonstrated that he was "acting to prevent harm to himself, rather than acting to his detriment"). *Cf. Smith v. Integral Consulting Servs., Inc.*, No. DKC-14-3094, 2016 WL 4492708, at *7-8 (D. Md. Aug. 26, 2016) (finding that the plaintiff had established the reliance element, among the other elements of negligent misrepresentation, because he stated that he would not have quit his current job and relocated if he had not believed the defendant's misrepresentation that the required government approval of the job offer to him had already been secured). Under these circumstances, Poole has

20

not established a genuine dispute of material fact as to whether he relied on the alleged misrepresentations by Mazda NAO personnel.

Where the evidence does not support a finding that Poole satisfied two of the required elements of a negligent misrepresentation claim, the Court need not address the remaining elements. The Court will grant summary judgment to Mazda NAO on the negligent misrepresentation claim.

**CONCLUSION**

For the foregoing reasons, Mazda NAO's Motion for Summary Judgment, ECF No. 61, will be GRANTED. A separate Order shall issue.

Date:  March 31, 2023

THEODORE D. CHUANG
United States District Judge